EXHIBIT G

```
 1            UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF MISSOURI
 2                  EASTERN DIVISION
 3   AMIE LITTLEFIELD,     )
                           )
 4                         )
         PLAINTIFF,        )
 5                         )
                           )
 6       vs.               ) Case No.
                           ) 4:19-CV-304-SEP
 7                         )
     AMERICAN              )
 8   ALTERNATIVE           )
     INSURANCE             )
 9   CORPORATION,          )
                           )
10                         )
         DEFENDANT.        )
11
12
13
              DEPOSITION OF RONALD BIRDSONG
14         TAKEN ON BEHALF OF THE DEFENDANT
                    JUNE 13, 2022
15
          REPORTED BY STACY L. HEARST, CCR 923
16
17               SEE INDEX PAGE 2
18
19
20
21
22
23
24
25
```

```
 1      Q     And what is your position with
 2   St. Luke's hospital?
 3      A     Network director of security.
 4      Q     And could you provide a
 5   description of your job duties and, you know,
 6   what your day-to-day entails?
 7      A     Director of security basically at
 8   two different hospitals, St. Luke's in
 9   Chesterfield, St. Luke's in Des Peres, and I
10   oversee all security matters.
11      Q     And so, are you primarily based at
12   the 232 South Woods Mill Road, Chesterfield
13   location?
14      A     Yes, I am.
15      Q     And how many days per week are you
16   there?  Is that five days a week?  How is
17   your --
18      A     Five days, yes.
19      Q     Okay.  I wasn't sure if your time
20   was split between locations.  Okay.
21            And how long have you been
22   employed by St. Luke's Hospital?
23      A     Twenty-four years.
24      Q     Okay.  So, you were employed at
25   St. Luke's at the time this incident took
```

```
 1    not saved in any system in possession of
 2    St. Luke's?
 3        A     I am sorry.  What?
 4        Q     Prior versions of that policy
 5    wouldn't be saved on any system at St. Luke's?
 6        A     No.
 7        Q     Do you recall what policy
 8    regarding compliance with police
 9    investigations would have been in effect on
10    November 24 of 2010?
11        A     That would be the second document.
12              Could you repeat the question?
13        Q     So, it's my understanding based on
14    what you just said that neither of those two
15    policies were in effect on November 24th,
16    2010.  And you testified earlier that you were
17    employed at St. Luke's as of the date of the
18    incident.
19              Could you just, you know, to the
20    best you can, explain what kind of process
21    pertaining -- or protocol pertaining to
22    compliance with police investigations was in
23    effect as of 2010?
24              MR. CEJAS:  Let me just object
25    to foundation real quick.  I don't think that
```

1  submitted a request to St. Luke's Hospital?
2       A     No.
3       Q     If you look to request number four
4  here, it says, Any maps regarding video
5  recording equipment pertaining to St. Luke's
6  Hospital at 232 South Woods Mill Road,
7  Chesterfield, Missouri 63017, as they were in
8  place on or around November 24th, 2010.
9             Did you produce any documents
10 pursuant to this request?
11      A     Yes.
12      Q     And just so I can mark it as an
13 exhibit, which document are you referring to?
14      A     All three.
15      Q     Okay.  So, all three of those
16 documents were produced pursuant to request
17 number four?
18      A     Yes.
19      Q     Can I just mark this as Exhibit 2?
20 Sorry.  Exhibit 3.
21            (Exhibit 3 was marked for
22 identification.)
23 BY MR. KNUDSEN:
24      Q     First of all, these videos look
25 like they are dated May 19th, 2022.

1           Were these -- I guess I will start
2      out by asking were these cameras in these
3      present locations as identified or as shown in
4      these pictures as of November 24th, 2010?
5           A     Yes.
6           Q     And they have not been changed in
7      any way?
8           A     No.
9           Q     So, if you turn to request number
10     five, it states, Any documents pertaining to
11     Amie Standal, now Littlefield, an employee of
12     Monarch Fire Protection District at St. Luke's
13     Hospital at 232 South Woods Mill Road,
14     Chesterfield, Missouri 63017 on November 24th
15     to 25th of 2010.  This includes any medical
16     treatment of Amie Standal, now Littlefield,
17     report of injury regarding Amie Standal
18     Littlefield and treatment of a patient of Amie
19     Standal Littlefield, identity has been
20     previously exchanged among the parties.
21     St. Luke's need not reproduce information
22     previously produced pursuant to protective
23     order in this matter.
24                So, did you produce any additional
25     documents pursuant to request number five?

```
 1       Q     Yes.
 2       A     Right, to me.  I am the final
 3  person to see them.
 4       Q     So, all reports made regarding
 5  similar incidents as the one which occurred on
 6  November 24th, 2010 eventually have come
 7  before you?
 8            MR. CEJAS:  Let me just object
 9  real quick.  When you say similar incidents, I
10  am not sure what you mean.
11            MR. KNUDSEN:  Oh, sorry.
12  BY MR. KNUDSEN:
13       Q     So, if somebody were claimed to
14  have been injured on St. Luke's property and
15  made a report about it, would that eventually,
16  all such reports would have eventually come
17  before you?
18       A     Yes.
19       Q     And no report regarding such a
20  circumstance was ever filed regarding an
21  incident on November 24th, 2010?
22       A     I am sorry.  Repeat the first
23  part?
24       Q     No such report of anybody being
25  injured on St. Luke's Hospital was made on
```

1  November 24th or afterwards pertaining to --
2  sorry, Amie Littlefield, then Standal?
3       A    No report.
4       Q    And you searched both for Standal,
5  S-T-A-N-D-A-L, and Littlefield,
6  L-I-T-T-L-E-F-I-E-L-D?
7       A    Yes.
8       Q    And Amie being A-M-I-E?
9       A    Yes.
10      Q    And you checked your records for
11 such reports filed by Adam Coughlin, A-D-A-M
12 C-O-U-G-H-L-I-N, as well?
13      A    Yes.
14      Q    That's all I have for you.
15           Have you understood all my
16 questions today?
17      A    Yes.  Yes, sir.
18           MR. CEJAS:  Brian, anything?
19           CROSS EXAMINATION
20 BY MR. WINEBRIGHT:
21      Q    Mr. Birdsong, can you hear me?
22      A    Yes, I can hear you.
23      Q    My name is Brian Winebright.  I
24 represent the plaintiff in this matter, Amie
25 Littlefield.

1  warning drivers about ambulance traffic?
2      A    No.
3      Q    As you enter the tunnel from the
4  side with the blue arrow, I guess that's the
5  Highway 141 side?
6      A    Correct.
7      Q    Are there different lanes of
8  travel for public vehicles or ambulances?
9      A    No.
10     Q    If you enter the tunnel from the
11 blue side, you would reach the ambulance
12 entrance first, followed by the public
13 entrance.  Fair?
14     A    Correct.
15     Q    In 2010, if St. Luke's were to
16 receive a request for security footage within
17 the thirty- to sixty-day timeframe in which
18 the footage still existed, what would -- how
19 would St. Luke's respond to that request?
20     A    Depends where it came from.
21     Q    If it was similar to a case like
22 this, if you received a deposition notice or a
23 subpoena requesting that footage, what
24 processes would be undergone to provide that
25 footage to the requesting party?

 1      A      It would be copied onto a disc.
 2      Q      Let me -- I guess I am going to
 3  try to break it down more.
 4             So, you received the request,
 5  would that request go to you as the director
 6  of security?
 7      A      It should.
 8      Q      Would it come directly to you or
 9  how would it get in your hands back in 2010?
10      A      It could have come through our
11  risk manager office, it could have come
12  through CEO's office.
13      Q      Would it be up to you to decide
14  whether or not responsive documents or video
15  were produced or was that someone else's
16  responsibility in 2010?
17      A      I didn't quite understand what you
18  said.  Excuse me.
19      Q      Back in 2010 we are talking, if
20  you received a copy of the request seeking
21  surveillance footage, it made its way to your
22  desk, was it ever your job to determine
23  whether or not that footage was produced, or
24  was that a decision made by someone else?
25      A      To produce it, it would be my

```
 1    decision.
 2        Q      And what factors would you
 3    consider back in 2010 whether or not to
 4    produce footage?
 5        A      Where the request came from.
 6        Q      And if you received a request from
 7    an attorney's office pursuant to a case like
 8    this requesting surveillance footage, would
 9    you typically produce that without a subpoena
10    being required or would you normally require
11    something more?
12        A      I would produce it and give it to
13    the case management department to determine
14    whether or not it would be sent to the
15    attorney.
16        Q      Okay.  So, we might be using the
17    word produced too liberally here.
18               What I meant produced, my
19    question, I was kind of indicating making the
20    response and giving it to the requesting
21    party.
22               When you just said produced, you
23    mean giving that to the case management team?
24        A      Yes.
25        Q      And if we need to go off the
```

1  have to be now, of course, I wanted to take a
2  quick break so I can call Max.  Is that okay?
3             MR. WINEBRIGHT:  Yeah.  I am
4  actually -- let me do that now.  I am just
5  looking at my notes.  I don't think I have
6  much more.  We can go off the record real
7  quick.
8             MR. CEJAS:  Take a five-minute
9  break.
10            (A break was had off the
11 record.)
12            MR. KNUDSEN:  Everybody okay?
13            MR. CEJAS:  You can go ahead.
14      A      Yeah.  In my testimony, I used the
15 term case management; it should be risk
16 management.
17            And also, any request for video or
18 reports or anything like that don't come
19 directly to me.  They go to case management --
20 there I go again, they go to risk management
21 and they, in turn, contact me for that
22 information.  Okay.
23 BY MR. WINEBRIGHT:
24      Q      So, in response to those, my
25 earlier questions where you say case

1  management, you meant to say risk management?
2       A    Yes, sir.
3       Q    Okay.  I actually looked through
4  my notes.  I don't have any additional
5  questions.  I believe Max may have a few for
6  you.
7                REDIRECT EXAMINATION
8  BY MR. KNUDSEN:
9       Q    Yes.  Just a couple more here.
10           So, if risk management were to
11 receive a request for, you know, somebody
12 being injured on St. Luke's Hospital including
13 a request for recordings such as the ones
14 showed, such as the footage shown in
15 Exhibit 3, it would have been St. Luke's
16 standard procedure to preserve such a
17 recording.  Right?
18      A    Correct.
19      Q    And if the police would have asked
20 for such recording, have you -- has
21 St. Luke's -- scratch that.  Let me start
22 over.
23           If the police would have asked for
24 a recording, would you have turned -- would
25 St. Luke's have turned that over to the

1  police?
2     A    Yes.
3     Q    And has St. Luke's -- and this is
4  all in the 2010 time period, so would that
5  apply, my previous two questions, would that
6  apply -- would that be the same in 2010?
7     A    Correct.
8     Q    Specifically November 24th, 2010?
9     A    Correct.
10    Q    And has St. Luke's during the
11 entire twenty-four years you have been there
12 ever denied a police request for video
13 footage?
14    A    Have we denied?
15    Q    Yes.
16    A    No, we have never denied.
17    Q    So, turning to Exhibit 3, those
18 angles there, is there any way to actually go
19 back and determine if a different angle ever
20 existed --
21    A    No.
22    Q    -- in that specific location?
23    A    No.
24    Q    So, in your experience at
25 St. Luke's, have you used those video

1  recordings to identify license plates?
2      A    No.
3      Q    Have you used those footage to
4  identify, you know, individuals if say
5  St. Luke's was investigating a report?
6      A    Yes.
7      Q    And could you describe what that
8  process would look like?
9      A    Review of the camera, I mean...
10     Q    So, you would look at the camera
11 first?
12     A    Correct.
13     Q    And then would you speak with
14 individuals working in that emergency
15 department after reviewing the camera footage?
16          I guess, if you are going back to
17 identify individuals when a report is made,
18 can you just kind of walk me what the
19 procedure was in place in 2010?
20     A    It depends, what we are looking
21 at.
22     Q    But you could have used that
23 footage to identify individuals. Correct?
24     A    Correct.
25     Q    And that has been -- that, as of

```
 1    November 24th, 2010, St. Luke's had used
 2    footage from that tunnel to identify --
 3         A     St. Luke's what?
 4         Q     St. Luke's would have -- could
 5    have identified individuals using that camera
 6    footage.  True?
 7         A     Not by name, but we could identify
 8    the person.
 9         Q     And then what could have came next
10    in the process of attempting to identify that
11    individual?
12         A     We would have went over there to
13    the ER.
14         Q     But there is no way of being able
15    to do that now with respect any footage taken
16    on November 24th, 2010.  Correct?
17         A     Correct.
18         Q     And that's because such footage no
19    longer exists?
20         A     Correct.
21         Q     So, that -- the image I believe on
22    page two, showing kind of the exit right
23    there, or -- no, you are looking at it.  That
24    page.
25         A     Here?
```

```
 1        Q      ==Yes.==
 2        A      ==Okay.==
 3        Q      ==So, that was capable of==
 4   ==identifying vehicles coming in and leaving==
 5   ==through that --==
 6        A      ==Correct.==
 7        Q      ==-- tunnel entrance.  Correct?==
 8        A      ==Correct.==
 9        Q      ==So, even though the angle does not==
10   ==show vehicles parked there, it would be==
11   ==capable of identifying vehicles backing out of==
12   ==those spots.  Correct?==
13        A      ==Correct.==
14        Q      Okay.  So, with respect to the
15   document request that you could not locate any
16   documents pursuant to your searches, would
17   those -- as of November 24th, 2010, would
18   those documents have been kept in the ordinary
19   course of St. Luke's business?
20        A      Which documents?
21        Q      Those requested of you in Exhibit
22   A, to which you stated earlier that you could
23   not produce?
24        A      These?
25        Q      No.  So, that's an example of a
```